# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: December 10, 2019

| | |
|---|---|
| * * * * * * * * * * * * * | UNPUBLISHED |
| MONICA DASILVA, | |
| * | No. 18-1282V |
| Petitioner, | |
| v. | Special Master Gowen |
| | |
| SECRETARY OF HEALTH | Motion to Dismiss; Influenza ("Flu"); |
| AND HUMAN SERVICES, | Necrotizing Myopathy; Statute of |
| | Limitations; Equitable Tolling; Mental |
| Respondent. | Incapacity; Physical Incapacity. |
| * * * * * * * * * * * * * | |

*Judson T. Pitts*, Tycksen & Shattuck, LLC, Draper, UT, for petitioner.
*Heather L. Pearlman*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION GRANTING MOTION TO DISMISS[1]

On August 23, 2018, Monica DaSilva ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2]  The petition was filed approximately ten months after the expiration of the statute of limitations period.  Petitioner alleges that she was mentally and/or physically incapacitated for over sixteen months, which should justify the application of equitable tolling and render her claim timely filed.  A full review of the evidence does not support that finding.  Accordingly, respondent's motion to dismiss the petition is **GRANTED.**  The petition is **DISMISSED.**

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims.  The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7.  **This means the opinion will be available to anyone with access to the Internet.**  Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes  medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).  An objecting party must provide the court with a proposed redacted version of the opinion.  *Id.*  **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.**  *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-1 to 34 (2012) ("Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.     Procedural History

On August 23, 2018, petitioner filed this claim *pro se*.  Petition, ECF No. 1.  Petitioner alleged that as a result of receiving an influenza ("flu") vaccination received on October 17, 2014, she developed polymyositis,[3] inclusion body myositis,[4] and/or acute necrotizing myopathy[5] with residual symptoms lasting for more than six months.  *Id.* at ¶¶ 2-5.  Petitioner also submitted limited medical records which reflect her presentation for medical treatment in November 2014.  ECF No. 1, Attachments 2-20 (subsequently stricken for failure to meet the Vaccine Guidelines, pursuant to Order issued January 7, 2019 (ECF No. 21)).

During an initial status conference, I discussed that the petition seemed to be filed "approximately ten months outside of" the statute of limitations period.  Scheduling Order filed September 18, 2018, ECF No. 8.  Petitioner confirmed that this was true but requested an exception to the statute of limitations due to the severity of her injury, thus invoking the doctrine of equitable tolling.  *Id.*  Respondent supported dismissal of the claim and was ordered to file a formal motion to that effect.  *Id.*  Petitioner was ordered to seek counsel to represent her in the claim, including filing of a response to the motion to dismiss.  *Id.*

On October 10, 2018, respondent filed a motion to dismiss the petition.  Respondent opposed the application of equitable tolling based on mental and/or physical incapacity to vaccine injury claims.  Respondent contended that even if equitable tolling for incapacity is available in the Vaccine Program, in this specific case, petitioner has not established that she was physically or mentally incapacitated to the extent that she was prevented from timely filing her claim.  Moreover, petitioner has not shown that her incapacity persisted for a sufficient period to toll the statute of limitations to render her claim timely filed.  Respondent's Motion to Dismiss, ECF No. 9.  Subsequently, I granted petitioner several extensions of time to obtain counsel.  ECF Nos. 10-17.  On February 6, 2019, attorney Mr. Judson Pitts was substituted as petitioner's

---

[3] Myositis, also known as inflammatory myopathy, is inflammation of a voluntary muscle.  *Dorland's* at 1225.  Polymyositis is "chronic, progressive myositis with symmetrical weakness of the limb girdles, neck, and pharynx… There is usually associated pain and tenderness… It is also sometimes associated with malignancy and may be accompanied by characteristic skin lesions."  *Id.* at 1490.

[4] Inclusion body myositis is "a progressive type of myositis that primarily involves muscles of the pelvic region and lower limbs."  *Dorland's* at 1225.

[5] Necrotizing myopathy is not defined in *Dorland's*.  The Myositis Association provides that patients with various forms of myopathy, including necrotizing myopathy, may experience symptoms of "weakness in the muscles closest to the center of the body, such as the forearms, thighs, hips, shoulders, neck, and back; difficulty climbing stairs and standing up from a chair; difficulty lifting arms over the head; falling and difficult getting up from a fall; and a general feeling of tiredness."  These various forms of myopathy are associated with elevated creatine kinase levels.  However, necrotizing myopathy is associate with muscle biopsy that "show[s] much less inflammation in the muscle tissue" but "increased evidence of muscle cell death, or necrosis."  The Myositis Association, *Necrotizing Myopathy*, available at https://www.myositis.org/about-myositis/types-of-myositis/necrotizing-myopathy/ (last accessed November 14, 2019).  The Myositis Association as well as the National Institutes of Health categorize necrotizing myopathy as an immune-mediated condition.  *Id; see also* National Institutes of Health – Nationals Center for Advancing Translational Sciences – Genetic and Rare Diseases Information Center, *Necrotizing Autoimmune Myopathy*, available at https://rarediseases.info nih.gov/diseases/13307/necrotizing-autoimmune-myopathy (last accessed November 14, 2019).

counsel.  ECF Nos. 18, 20.  The Court struck the medical records accompanying the *pro se* petition (ECF No. 1 - Attachments 1-20), her affidavit (ECF No. 14), and her response to the motion to dismiss (ECF No. 19) for not complying with the Vaccine Guidelines.  ECF No. 21.  The Court also struck additional medical records filed by petitioner's counsel (ECF No. 22, ECF No. 23 – Attachment 1) for the same issues.  ECF No. 28.

On February 22, 2019, petitioner refiled her response to the motion to dismiss.  ECF No. 23.  Therein, petitioner specified that the onset of her injury was within three days of the flu vaccine, by October 20, 2014, when she developed "muscle weakness and swallowing difficulties."  *Id.* at 4.  Petitioner also specified that she was "incapacitated mentally and physically from the onset of her physical symptoms through the Spring of 2016, a period of sixteen (16) months."  *Id.* at 13, *see also id.* at 17-23.  Petitioner contended that the statute of limitations should be equitably tolled to render her claim timely filed.  *Id.* at 14-23.

On March 25, 2019, respondent filed a reply.  ECF No. 24.  Respondent argued that equitable tolling on the basis of mental or physical incapacity should not be available to petitioners in the Vaccine Program.  *Id.* at 3-7.  Respondent argued that furthermore, the materials filed to date did not establish that she was mentally or physically incapacitated for at least ten months (until late August 2015), as necessary to make her Vaccine Act petition timely filed.  *Id.* at 7-10.  Respondent noted that many of the medical records dated from both before and after the vaccination at issue remain outstanding and: "For the purposes of petitioner's claim that she was incapacitated through at least August 23, 2015, the dearth of medical records dated from March 18 – August 23, 2015, is particularly relevant."  *Id.* at n. 5.

During a status conference with petitioner and both parties' counsel, I discussed that it was "crucial that petitioner file all medical records and other evidence supporting her claim."  Scheduling Order filed June 6, 2019 (ECF No. 29) at 2.  It appeared that petitioner "ha[d] not filed any (or hardly any) medical records dating between March/ April 2015 until early 2016."  *Id.* at 3.  "I stressed that petitioner should file all medical records and other evidence going towards her health particularly from March/ April 2015 until early 2016.  This includes but is not limited to all records of primary care, neurology, psychology, rehabilitation, and home health care."  *Id.*  As discussed in a separate order (ECF No. 28), the Court had stricken all of petitioner's exhibits to date because they did not comply with the Vaccine Guidelines.  *Id.*  Petitioner was ordered to file a motion for authorization of any necessary subpoena(s), followed by "all medical records, affidavits, and other documentation in support of her claim (which includes refiling the documents that have been stricken, as well as filing records that have been newly obtained) and a Statement of Completion."  *Id.*

On August 14, 2019, petitioner filed exhibits 1-16 and a Statement of Completion.  ECF No. 40-43.  On September 5, 2019, respondent filed a supplemental response, in which respondent maintained that "equitable tolling on the basis of mental or physical incapacity is contrary to and unavailable under the Act; however, even if the Court determined otherwise, the newly filed evidence clearly demonstrates that such tolling is not warranted."  Respondent's Response to Supplemental Evidence filed September 5, 2019, ECF No. 46.  *Id.*  Petitioner has not filed further evidence or argument in support of her claim.  I find that this matter is ripe for adjudication.

## II.    Legal Standard[6]

### A.  Statute of Limitations

The Vaccine Act provides:

> [I]f a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury…"

42 U.S.C. § 300aa-16(a)(2).

Congress did not include a discovery rule, either expressly or by implication, in the Vaccine Program.  In other words, the statute of limitations does not depend on whether the petitioner "knew or reasonably should have known of a causal connection" between the vaccine and the injury alleged.  *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 13240 (Fed. Cir. 2011) (en banc).  Instead: "The statute of limitations begins to run on a specific statutory date: the date of occurrence of the first symptom or manifestation of onset of the vaccine-related injury recognized as such by the medical profession at large."  *Id.*

Under the Vaccine Act, equitable tolling is available in "extraordinary circumstances." *Cloer*, 654 F.3d at 1344, citing *Bailey v. Glover*, 88 U.S. 342, 349-50 (1874) (fraud or duress); *Pace v. DiGugielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, 161 L.Ed.2d 669 (2005) (providing that equitable tolling requires a litigant to have diligently pursued her rights, but 'some extraordinary circumstance stood in [her] way"); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 1996, 111 S. Ct. 453, 112 L.Ed.2d 435 (1990) (providing that equitable tolling is to be used "sparingly" in federal cases and has been limited to cases involving deception or the timely filing of a procedurally defective filing).

Many jurisdictions recognize equitable tolling on the basis of mental and/or physical incapacity.  *See, e.g.*, *Bartlett v. Department of the Treasury (I.R.S.)*, 749 F.3d 1 (1ˢᵗ Cir. 2014); *Brown v. Parkchester South Condominiums*, 287 F.3d 1316 (2ⁿᵈ Cir. 2004).  The Federal Circuit has concluded in the context of veterans' benefits appeals, codified at 38 U.S.C. section 7266(a), that equitable tolling is available on the basis of mental impairment:

> "[T]o obtain the benefit of equitable tolling, a veteran must show that the failure to file was the direct result of a mental illness that rendered him incapable of 'rational thought or deliberate decision-making,' or 'incapable of handling his own affairs or unable to function in society.'  A medical diagnosis alone or vague

---

[6] Decisions of special masters and the U.S. Court of Federal Claims (some of which are referenced in this opinion) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998).  By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014.

> assertions of mental problems will not suffice.  And, if he is represented by
> counsel during the relevant period, the veteran must make an additional showing
> that the mental illness impaired the attorney-client relationship."

*Barrett*, 363 F.3d at 1321 (internal citations omitted).  The Federal Circuit did not require a veteran alleging incapacity to demonstrate "due diligence".  *Id.*; *see also Hodge v. Sec'y of Health & Human Servs.*, No. 09-453V, 2015 WL 9685916 (Fed. Cl. Spec. Mstr. Dec. 21, 2015) (reasoning that "any steps to advance a legal claim would likely be considered evidence that the person could handle his [or her] affairs").  The Federal Circuit later held that veterans could obtain equitable tolling based on "physical illnesses or conditions that impair cognitive function or the ability to communicate".  *Arbas v. Nicholson*, 403 F.3d 1379, 1381 (Fed. Cir. 2005).

Special masters have applied the Barrett/ Arbas test to a limited number of vaccine petitions.  In *Hodge*, Special Master Moran reviewed the formal opinions of several medical professionals who had reviewed the petitioner's medical records.  *Hodge*, 2015 WL 9685916 at *11-20.  The petitioner's treating psychiatrist submitted a formal written opinion that the petitioner was generally not capable of managing his own affairs for over one year.  Respondent's expert psychiatrist opined that the petitioner "suffered a period of significant psychiatric decompensation."  *Id.* at *20.  Respondent's expert neuropsychologist opined that the petitioner was "severely impaired and lacked capacity" for approximately one year.  *Id.*  Special Master Moran found that these medical experts' opinions supported a finding of mental incapacity for over one year.  *Id.*

In *Gray*, I found that the petitioner had established mental incapacity for four months.  *Gray v. Sec'y of Health & Human Servs.*, No. 15-146V, 2016 WL 6818884 (Fed. Cl. Spec. Mstr. Oct. 17, 2016).  The medical records did not note cognitive concerns, which I found "not unreasonable" because those medical records were more focused on her physical condition.  However, "[n]early every record from provider office notes that petitioner was accompanied throughout the visit by her daughter or son-in-law."  *Id.* at *3.  There were numerous records of the daughter providing the petitioner's medical history, verbalizing understanding to the treatment plan, and actively making decisions about the treatment plan.  *Id.*  The medical providers noted that the daughter was a registered nurse (and thus had some formal training and expertise about these subjects).  *Id.*  In *Gray*, the petitioner also submitted detailed affidavits from her primary care physician, speech-language pathologist, a physician assistant, and several family members.  *Id.* at *3-4.  I reasoned that the affidavits *supplemented*, but *did not conflict* with the contemporaneous medical records.  The evidence supported a four-month period of mental incapacity meeting the standard necessary to toll the statute of limitations and render the petition timely filed.  *Id.* at *5-6.

Because *Hodge* and *Gray* remain pending and interlocutory appeals are not available in the Vaccine Program, respondent has not had the opportunity to seek review of this issue.  However, in the present case, respondent averred that equitable tolling based on either mental or physical incapacity appears to be incompatible with the Vaccine Program.  Resp. Mot. at 5-6, *citing Clubb v. Sec'y of Health & Human Servs.*, 136 Fed. Cl. 255, 263-64 (2018).  In *Clubb*, Judge Griggsby on the Court of Federal Claims expressed "misgivings about the doctrine of equitable tolling due to physical or mental impairment within the context of Vaccine Act

claims." Nevertheless, Judge Griggsby denied review of the special master's conclusion that *if* equitable tolling on the basis of physical incapacity merited equitable tolling, the petitioner in *Clubb* did not make the requisite showing. *Clubb*, 136 Fed. Cl. at 264-66. *See also K.G. v. Sec'y of Health & Human Servs.*, No. 18-120V, 2018 WL 5795834 (Fed. Cl. Spec. Mstr. Aug. 17, 2018) (dismissing a petition where, even assuming *arguendo* that equitable tolling is available due to mental incapacity, the vaccinee "had a legal representative/guardian looking after her interests for a large portion of the time in which she was allegedly mentally incapacitated" and "therefore is not excused from her failure to act diligently in exercising her rights"); *mot. for review den'd*, 142 Fed. Cl. 240 (2019), *notice of appeal*, Fed. Cir. No. 19-1690 (Mar. 25, 2019).

## B. Fact Evidence

The Vaccine Act requires a special master to consider the record as a whole. The Act also prohibits a special master from ruling in petitioner's favor solely based on her own allegation, "unsubstantiated by medical records or medical opinion." § 13(a)(1).

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records, which are required to be filed with the petition. §11(c)(2). The Federal Circuit has made clear that medical records "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528. This presumption is based on the linked propositions that (1) sick people visit medical professionals; (2) sick people honestly report their health problems to those professionals; and (3) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 993 F.2d at 1525. Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

When contemporaneous medical records conflict with later accounts (i.e., affidavits or oral testimony), special masters generally give greater weight to the medical records. *Murphy v. Sec'y of Health & Human Servs.*, No. 90-88V, 1991 WL 74931, at *4 (Fed. Cl. Spec. Mstr. April 25, 1991); *see also Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (Fed. Cl. 1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later").

Subsequently, the Court of Federal Claims has recognized four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). Later

testimony "must be consistent, clear, cogent, and compelling to outweigh medical records prepared for the purpose of diagnosis and treatment." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998)

In *La Londe*, the Court provided that the special master should consider all of these possibilities, as part of his or her responsibility to "consider all relevant and reliable evidence contained in the record." *Id.* at 204 (citing § 12(d)(3); Vaccine Rule 8). *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that a special master's rational determination about whether to afford greater weight to contemporaneous medical records than to later accounts, is reviewed only for an abuse of discretion).

## III.   Evidence Submitted

### A. Contemporaneous Records

### 1. Before October 17, 2014 Flu Vaccination

On August 21, 2014, petitioner established care with a chiropractor affiliated with Sanford Health in Dickinson, North Dakota. ECF No. 42-2 at 1-3. The chiropractic records reflect that petitioner's prior medical history included back pain associated with several traumatic incidents. Namely, in 2006, petitioner fell from a balcony. ECF No. 42-2 at 5. In 2007, during a mudslide in Brazil, petitioner had to jump out of a window and she fell onto her back. ECF No. 42-2 at 4-5. In 2013, she sustained whiplash and additional back pain when her car was hit by a train. ECF No. 42-2 at 4-5. Notwithstanding those injuries, petitioner enjoyed teaching dance lessons, outdoor activities, and working with children and seniors. ECF No. 42-2 at 2. She had previously been treated by a chiropractor in the state of Utah, before relocating to North Dakota. ECF No. 42-2 at 5; *see also* ECF No. 42-1 (application for training and employment as a commercial truck driver).

Upon presenting to the chiropractor in North Dakota in late August 2014, petitioner complained of pain, inflexibility, and stiffness in her left shoulder, left leg, right hand, and neck extending down to her lower back. ECF No. 42-2 at 1-2. She endorsed depression in the past. ECF No. 42-2 at 3. She denied numerous other symptoms including fatigue, muscle pain, muscle weakness, muscle cramps, loss of coordination, and difficulty of speech. ECF No. 42-2 at 3. The chiropractor assessed petitioner with cervical segmental dysfunction, cervicalgia, thoracic segmental dysfunction, lumbar segmental dysfunction, lumbalgia, and cervical muscle spasm. ECF No. 42-2 at 7.

Chiropractic treatment was associated with some improvement: for example, on September 7, 2014, petitioner reported that she felt "physically 100% better". ECF No. 42-2 at 13. But on September 21, 2014, petitioner was "concerned about upper body strength. [Her] physical strength has decreased a lo[t]." ECF No. 42-2 at 16.

On September 25, 2014, petitioner established care with a primary care provider also affiliated with Sanford Health in Dickinson, North Dakota. She reported past medical history including trauma secondary to the mudslide and past domestic abuse. She complained primarily of pain in the cervical and lumbar spine, for which she was already seeing the chiropractor. The

nurse practitioner at Dickinson Family Medicine ordered a "dexa" scan "to check [petitioner's] bone density and detect any signs of osteoporosis".  She also ordered x-rays of the cervical and lumbar spine.  The nurse practitioner also prescribed Wellbutrin (buproprion hydrochloride) for smoking cessation.[7]  The nurse practitioner instructed petitioner to make another appointment for an annual wellness exam, recheck of smoking cessation, and other complaints including menopause, weight loss, dry mouth, trouble swallowing, and hot flashes.  ECF No. 40-1 at 198-204.

On October 8, 2014, the chiropractor recorded "Consult.  Deg. Bone disease.  Bone density."  ECF No. 42-2 at 18.  On October 15, 2014, petitioner returned to the chiropractor, where she hand-wrote and signed a "patient subjective progress report", which lists the additional complaint: "hard time w/ balance no upper body strength."  ECF No. 42-2 at 19. Petitioner also wrote: "something happened a week ago I woke up and could barely walk or stand" and "Currently waiting for MRI[8] to see about surgery on the back.  What to think of acupuncture."  *Id.*

On October 15, 2014, the North Dakota Medicaid office sent a letter confirming petitioner's enrollment effective November 1, 2014.  *See also* ECF No. 42-2 at 26-27.

On October 17, 2014, petitioner received the flu vaccine at issue at the primary care practice.  ECF No. 42-2 at 28; *see also id.* at 30 (billing record listing the flu vaccine).  Petitioner did not submit any other records from this date.

### 2.  After October 17, 2014 Flu Vaccination

On October 20, 2014, petitioner returned to the chiropractor.  ECF No. 42-2 at 20.  She was "worried about [her] ability to walk and stand."  ECF No. 42-2 at 23.[9]

On November 7, 2014, petitioner returned to the primary care practice to review the x-rays of the lumbar and cervical spine, which revealed degenerative spondylosis.  Petitioner was late for the appointment and entered in a wheelchair.  She reported that she had fallen in the parking lot, but "yelled" at the provider for asking about it.  ECF No. 40-1 at 205-14.[10]

---

[7] *Dorland's* at 261, 2078.

[8] But note, it does not appear that the chiropractor or the primary care provider ordered MRIs, only x-rays.  *See* ECF No. 40-1 at 198-204.

[9] Petitioner avers that on October 20, 2014, she returned to the primary care provider where "They thought I had a mild case of the flu and told me to rest, but instead of subsiding, the symptoms intensified in scope and degree." ECF No. 40-6 at 3.  My review did not locate any records of petitioner going to the primary care provider, only the chiropractor, on this date.

[10] Petitioner avers that in "early November" 2014, she went to a hospital in North Dakota where: "Hospital staff examined [her] but discharged/released her after six (6) hours and would not accommodate her insistence that something was abnormal and terribly wrong with her body."  Pet. Response to Resp. Motion at 5; *see also* ECF No. 42-5 at 5 (medical records providing that petitioner "went to a hospital" in North Dakota sometime before November 15, 2014).  However, petitioner did not submit any records from any hospital in North Dakota.

On October 27, 2014, petitioner returned to the chiropractor for the twelfth of twelve scheduled appointments.  She "felt very weak."  There was "visible notice to hands, Reynaud's phenomenon."  ECF No. 42-2 at 24.

The next medical records are from November 15, 2014, petitioner presented to the emergency room at St. Mark's Hospital in Salt Lake City, Utah.  Petitioner reported a past history of "multiple traumatic experiences" over the past several years, which she and the treating providers characterized as post-traumatic stress disorder (PTSD).  ECF No. 42-5 at 2-5.

Petitioner reported "multiple, vague complaints for the past 2-3 months" including "difficulty swallowing, slurred speech, difficulty walking, and left-sided body weakness."  ECF No. 42-5 at 2.  She reported weight loss of "40 pounds in the past four months."  *Id.*  "Due to her weakness, she had been staying in bed mostly for the past month."  *Id.* at 3.  Two days prior, on approximately November 13, 2014, she had developed "L [left] arm weakness.  *Id.* at 4.  The medical records are somewhat inconsistent regarding petitioner's mental status at presentation.  She was recorded to be "oriented to person, place, and time… animated, talkative, smiling, and laughing" but also displayed "altered mental status" and "memory loss".  *See, e.g.*, ECF No. 42-4 at 296-299.

Lab work revealed severe rhabdomyolysis[11] and elevated creatine kinase ("CK")[12] above 11,000 U/l (compared to a reference range of 21-173 U/l).  ECF No. 42-5 at 7, 77.  An EKG/ECG showed no ischemic changes.  ECF No. 42-5 at 8.  An MRI showed minor periventricular signal changes in the left parietal lobe, which were "nonspecific and likely reflect[ed] early small vessel ischemic changes or potentially demyelinating process."  ECF No. 42-5 at 1.  A neurologist opined that the MRI findings would not explain all of her symptoms.  The severe rhabdomyolysis "could explain her generalized weakness though."  ECF No. 42-5 at 2.  Petitioner was admitted for fluids and further workup.  ECF No. 42-5 at 2.

Petitioner was initially suspected to have rhabdomyolysis from drug use due to a positive urine toxicology result.  ECF No. 42-2 at 19.  However, she denied drug use and repeat toxicology came back negative.  The treaters concluded that it was a false positive caused by petitioner's prescription for Wellbutrin (buproprion hydrochloride).  ECF No. 42-2 at 19-20, 2464.  A biopsy of muscle from the right thigh revealed "inflammatory myopathy consistent with inclusion body myositis."  ECF No. 42-4 at 100-02.  A subsequent MRI of the right thigh was also consistent with "acute idiopathic inflammatory polymyositis" but an acute infectious myositis and necrotizing fasciitis could not be excluded in the proper clinical setting."  ECF No. 42-4 at 22-23.  Petitioner was treated with steroids, to which she responded favorably.  ECF No.

---

[11] Rhabdomyolysis is "disintegration or dissolution of muscle, associated with excretion of myoglobin in the urine." *Dorland's* at 1637.

[12] Creatine kinase (CK) is an enzyme that "catalyzes the phosphorylation of creatine by ATP to form" phosphocreatine, which is "an important storage form of high energy phosphate, the energy source for muscle contraction." *Dorland's* at 429, 1437.  CK is an "important blood test for myopathies" because when muscle tissue is damaged, the cells release their contents into the bloodstream, causing elevated CK levels in the blood."  The Myositis Association, *Blood Tests – Creatine Kinase*, available at https://www.myositis.org/about-myositis/diagnosis/blood-tests/ (last accessed November 14, 2019).

42-4 at 19.  She also reported a history of tick bites for which she was put empirically on doxycycline.  ECF No. 42-4 at 19.  Her CK decreased to about 4,000.  ECF No. 42-4 at 19.

On December 4, 2014, petitioner was transferred to a different department or facility within St. Mark's Hospital – possibly focusing on rehabilitation, because she was directed to make outpatient follow-up appointments with psychiatry and rheumatology.  ECF No. 42-4 at 19.  She continued to report difficulty swallowing as well as choking.  On December 11, 2014, she failed a swallow study.  ECF No. 42-3 at 8.  On December 13, 2014, she was given a nasogastric feeding tube and was started on a dysphagia 1 (puree) diet.  ECF No. 42-3 at 9.  On December 24, 2014, petitioner was also given a PEG gastrostomy feeding tube.  ECF No. 42-3 at 10-14.  The discharge summary provides that petitioner "decided not to follow speech recommendations and [ate] foods and [drank] liquids despite being frequently educated on complications that could result from aspiration."  ECF No. 42-5 at 118.  Petitioner also worked with physical therapy and occupational therapy for strength maintenance but remained weak due to the nature of the disease.  ECF No. 42-5 at 118.  She was "consulting a doctor in Pennsylvania regarding alternative treatments."  ECF No. 42-5 at 118.  Petitioner was encouraged to follow up with neurology and rheumatology.  She was "in stable condition and… ready to be discharged to skilled nursing for long-term care with therapy" on January 2, 2015.  ECF No. 42-5 at 118.[13, 14]

Of note, around this time petitioner, her mother, and an acquaintance explored her coverage options.  The agent requested a price quote from Select Health on December 26, 2014 and enrolled her in a plan on January 8, 2015, that became effective on February 1, 2015.  ECF No. 40-1 at 1356, ECF No. 40-6 at 4-5.

On January 5, 2015, petitioner was admitted to Spring Creek Healthcare Center.  ECF No. 43-1 at 93.  Upon her admission, a registered nurse conducted a functional range of motion and voluntary movement assessment.  Petitioner could look from side to side and tip head from side to side.  She could not touch palms to back of head or touch hand to opposite shoulder.  She was able to open and close both hands.  She could lift and bend both legs at the hip and knee (to at least 90 degrees).  She could pull up and push down the toes on each foot.  ECF No. 43-1 at 62-65.  However, she had limitations with balance and muscular coordination requiring use of a wheelchair.  ECF No. 43-1 at 65.  She needed assistance to and from a toilet or bed pan for elimination but retained control over urinary and bowel function.  ECF No. 43-1 at 65, 67, 79-81.  These records reflect not only physical capacity, but also mental capacity in that petitioner was able to perceive and follow her treating physicians' instructions.  The records also provide that petitioner was "alert and oriented to person, place, time, and situation."  ECF No. 43-1 at 93; *see also id.* at 60 (providing that with regard to "cognitive skills for daily decision making",

---

[13] The available records suggest that on January 2, 2015, petitioner was transferred to the Sandy Regional Health Center in Sandy, Utah.  ECF No. 42-5 at 145, 226, 235; ECF No. 43-1 at 41, 90-91.  Eric Ivie, a licensed certified nurse assistant, avers that he initially encountered petitioner as a patient at the Sandy facility in January 2015.  ECF No. 40-6 at 34.  However, petitioner has not submitted any records from the Sandy facility.

[14] Petitioner, her mother, and a CNA hired to assist her at home all aver that she was admitted to the "Highland Ridge" inpatient facility for some period of time.  ECF No. 40-6 at 5, 31, 34.  Their affidavits suggest that this is different from St. Mark's Hospital, the Sandy facility, the Spring Creek facility, and the University of Utah.  However, if petitioner was in this facility, the exact timing is unclear.  She has not submitted any records from this facility.

petitioner had "modified independence – some difficulty in new situations only"), 68 (providing that her comprehension was "quick"). She expressed anxiety about sharing a room with another patient. She insisted on speaking to an administrator and then received a private room. ECF No. 43-1 at 93.

On January 6, 2015, petitioner requested ice chips and the puree diet and denied pain. ECF No. 43-1 at 92. She "declined the pneumo shot and the flu shot saying that she had already had them earlier this year." ECF No. 43-1 at 93; *see also id.* at 50-53. Her boyfriend was present throughout the day; they "seemed to argue frequently about her situation/ prognosis/ diagnosis." ECF No. 43-1 at 93. In the afternoon, a physical therapist arrived and petitioner explained that she was leaving with her boyfriend to attend to "banking and other odds and ends." She returned within two hours. ECF No. 43-1 at 92. Upon returning that evening, petitioner asked for the facility to "ban" her boyfriend because she had gone through his phone and found evidence suggesting that he wanted to harm her. ECF No. 43-1 at 91-92. She contacted "her attorney"[15] who notified the police that the boyfriend was present at the facility. After the police arrived, the boyfriend left peacefully. ECF No. 43-1 at 93.

Over the next few days, petitioner remained "alert and oriented" and "able to make her needs known." She was "fixated on having her labs to show people her levels that indicate she is sick" and she expressed preferences regarding food and pain medication. ECF No. 43-1 at 87-88. She required physical assistance with many tasks but was able to disconnect her PEG gastrostomy tube several times. ECF No. 43-1 at 87-88. On January 8, 2015, petitioner and her mother participated in an initial care conference. ECF No. 43-1 at 39-40, 88.

A rehabilitation progress note dated January 11, 2015, provides that petitioner was able to complete recommended exercises, including flexion of her lower extremities and transfer training, with "extensive assistance". ECF No. 43-1 at 36-38.

On January 13, 2015, an initial physical therapy evaluation took place. The information was obtained from petitioner, her chart, observations of her, and the staff members, the chart. ECF No. 43-1 at 33. Petitioner communicated various details including her prior level of function, personal details, current experience of pain, preferences during her stay at the facility, and goals for discharge. ECF No. 43-1 at 25-34, 86-87.

On January 14, 2015, while a practical nurse and a certified nurse assistant were transferring petitioner from bed into a chair, petitioner became agitated and argumentative. She stated that those individuals were not permitted in her room; other staff members(s) assisted her for the rest of the day. ECF No. 43-1 at 86. Later that day, RA Travis Miller "spoke with [petitioner] regarding her medical options regarding [discharge]. [Petitioner] was open to [discharg]ing to another hospital to continue treatment with both psych and medical. [Petitioner's] mother [was] adamant that she does not have any psych issues and states her

---

[15] This may be a reference to an attorney who has known petitioner since 2010 and helped her with several charitable endeavors. He recalls visiting petitioner at St. Mark's Hospital, "a nursing home," and the University of Utah Hospital "between the dates of November 2014 and March 2015. His affidavit is provided at ECF No. 40-6 at 28.

daughter is making them up.  RA will continue to assist [petitioner] in finding proper [discharge] plan/ treatment options." ECF No. 43-1 at 86.

On January 15, 2015, petitioner left with "a male 'CNA' from Sandy Rehab" without saying where she was going.  ECF No. 43-1 at 86.  Later that day, the Spring Creek facility issued a discharge notice on the grounds that it could not address petitioner's needs, she had been noncompliant with medical orders, and that her needs could be addressed with home health.  ECF No. 43-1 at 85.

On January 16, 2015, the Spring Creek facility discharged petitioner with orders for home health for occupational therapy, physical therapy, and nursing services.  She was also to follow up with her primary care provider in ten days.  ECF No. 43-1 at 1, 7.  Petitioner stated that she "may admit herself to the U of U for further testing".  ECF No. 43-1 at 85.

On January 18, 2015, petitioner presented to the emergency room at the University of Utah.  ECF No. 40-1 at 95-112.  The attending physician spent significant time contacting the Spring Creek facility and speaking with the petitioner.  ECF No. 40-1 at 101.  The attending physician concluded that the Spring Creek facility had discharged petitioner for being "non-compliant with care" and had made arrangements for home nursing.  *Id.*  Petitioner had presented to the hospital hoping to be admitted for a second opinion regarding her disease process.  *Id.*  However, admission was not indicated at that time.  *Id.*  Petitioner was discharged home in stable condition with a wheelchair and referral for outpatient appointments.  *Id.*

On January 21, 2015, petitioner had an initial appointment with a family medicine provider at the University of Utah.  She reported a history of depression and anxiety, as well as current stressors associated with the diagnosis of myositis.  She expressed "worries about her mother, who is her primary caretaker, and the stress of her illness on their relationship."  The mother was present during the appointment and was given "names of therapists" for petitioner.  The doctor set forth a plan for coordinating complex care including psychiatry, rheumatology, neurology, physical therapy, and speech therapy.  ECF No. 43-2 at 35-44.

On January 21, 2015, petitioner also had an initial consult with a rheumatologist at the University of Utah.  The rheumatologist planned to review the muscle biopsy from St. Mark's Hospital, consult with a neuromuscular neurology specialist, and consider treatment with IVIg.  If petitioner developed worsening muscle weakness or shortness of breath, she should go to the emergency room.  ECF No. 43-2 at 17-25.

On January 25, 2015, petitioner presented to the emergency room at the University of Utah.  She and her mother reported that she was supposed to taper off the steroids.  ECF No. 43-2 at 64.  She complained of overall weakness as well as headache, nausea, headache, eye pain, and night sweats.  ECF No. 43-2 at 54, 64.  Lab work revealed elevated troponin.  ECF No. 43-2 at 67.  Cardiology evaluated petitioner in the emergency room and were suspicious for cardiomyopathy, although she also "exhibit[ed] symptoms of dehydration and failure to thrive."  ECF No. 43-2 at 70.  Cardiology admitted her for further work up including an EKG, which was normal.  Cardiology did not see further evidence for cardiomyopathy, acute coronary syndrome, or cardiomyositis.  ECF No. 43-2 at 75-76.  They recorded that "this may represent a failure to

thrive situation with the patient having recently returned home from a SNF [skilled nursing facility] and finding her ADL [activities of daily living] extremely difficult in her current state." ECF No. 43-2 at 76.  Neurology, rheumatology, physical therapy, occupational therapy, and speech therapy were consulted.  These records reflect that petitioner had physical limitations and dysphagia.  However, she was alert, oriented, and able to communicate on her own behalf.  ECF No. 43-2 at 76-100, 106-27.  Although her mother signed the admission consent form, petitioner herself signed a form consenting to an EKG.  Pet. Ex. 43-2 at 550-52.

On January 28, 2015, petitioner was transferred to the neurology department.  ECF No. 43-2 at 101-05.  She continued steroids and began IVIg.  ECF No. 43-2 at 128-29; *see also id.* at 130-543 (subsequent records).  She stopped using the PEG gastrostomy tube and was able to tolerate a puree diet.

On January 30, 2015, she was transferred to an inpatient rehabilitation facility also within the University of Utah.  ECF No. 43-2 at 544-48; *see also id.* at 2426-28 (inpatient rehabilitation admission and treatment forms, hand-signed by petitioner).  She participated in physical therapy, occupational therapy, and speech therapy.  She continued to receive IVIg and was followed by neurology and psychology.  Regardless, she communicated on her own behalf about her motivation to participate in therapy and preferences regarding care.  She continued to have significant muscle weakness.  However, she demonstrated progress with various tasks including self-care, dressing, feeding, preparing food, and ambulation.  ECF No. 43-2 at 589-1207.

On February 11, 2015, neurology recorded that since starting IVIg, petitioner was making significant improvement in swallowing; arm, trunk, and leg strength; and mental attitude.  She would continue with IVIg and taper down steroids.  If she had lack of improvement or worsening, they would consider starting rituximab.  She would return in two months.  ECF No. 43-2 at 765-66, 2540-55.  Additionally, on February 18, 2015, the PEG gastrostomy feeding tube was removed.  ECF No. 43-2 at 855.

Throughout the inpatient rehabilitation stay, a psychologist met with petitioner (and her mother, in some family sessions).  Petitioner expressed benefiting from the "support" and "structure" in the inpatient facility.  She expressed anxiety about maintaining the same after discharge.  She and the psychologist discussed cognitive and behavioral stress management strategies.  ECF No. 43-2 at 653-55, 749-51, 843-44, 875-76, 941-42, 958-59, 968-69, 1038-39, 1067-68, 11-21-22.  Following a neuropsychological evaluation, she was assessed with "unspecified anxiety disorder" and "unspecified major neurocognitive disorder (significant concern for steroid involvement."  The psychologist recommended monitoring and tapering off steroids, cognitive and behavioral strategies to help cope with anxiety and improve sleep, focusing on recovery rather than returning to work, accepting her mother's assistance while adjusting back home, and continued psychological/ psychiatric treatment.  ECF No. 43-2 at 1176-84; *see also id.* at 1189-90, 1215-16.

On March 17, 2015, petitioner, accompanied by her occupational therapist, completed a "community reintegration outing".  She still had some degree of muscle weakness, needing assistance for example transferring from the car and opening heavy doors.  However, she walked with a front-wheel walker.  She also had sufficient arm strength to change the music on the car

radio, film students' dance performances on her phone, and hug students.  The therapist recorded that petitioner was "progressing with functional mobility and FWW [front-wheel walker] and overall activity tolerance", was prepared for discharge and continued outpatient therapy.  ECF No. 43-2 at 1198-1200; *see also id.* at 1201-07 (additional evaluations before discharge).  Petitioner was discharged to her home on March 18, 2015.  ECF No. 43-2 at 1208-14.

Of note, during her stay at the University of Utah, petitioner initiated a claim for Social Security Disability Insurance (SSDI).  Her initial application was dated January 29, 2015.  *See* ECF No. 40-1 at 1287.  Petitioner and a social worker discussed the SSDI application at least three times in early February 2015.  ECF No. 43-2 at 643, 677, 733.  On February 23, 2015, a Social Security Administration (SSA) employee conducted a telephone interview with petitioner regarding her SSDI claim.  ECF No. 40-1 at 1-12; see also ECF No. 43-2 at 906 (medical record that petitioner "missed 45 minutes of [physical therapy] of treatment due to [this] important phone call with social security").  Petitioner provided the interviewer with the names of several facilities where she was treated.  ECF No. 40-1 at 8-10; *see also id.* at 13-24 (requests to those facilities for medical records, completed by petitioner and the interviewer).  Sometime in March 2015, petitioner handwrote and signed a detailed eight-page "function report" and a list of six individuals with objective information about her disability claim.  *Id.* at 28-36; *see also id.* at 1304 (petitioner and SSA employees' communications about necessary records).

Following her discharge home on March 18, 2015, petitioner participated in outpatient therapy.  She used an electric wheelchair and required assistance for many physical tasks due to overall muscle weakness, gait abnormality, and balance deficits.  She was noted to be independent with self-feeding and toileting.  She required minimal assistance with grooming, dressing, and bathing.  Her cognition was assessed to be within functional limits with no apparent deficits.  ECF No. 43-2 at 2467-80; *see also id.* at 2481-82 (outpatient therapy intake form handwritten by petitioner).

On March 30, 2015, at the first outpatient neurology visit, she was found to be stable.  She reported leg swelling, which was believed to be due to chronic steroid use and decreased mobility; she was fitted for compression stockings and told to elevate her legs above her head several times a day.  She received a referral for a colonoscopy.  ECF No. 43-2 at 2492-94.  She handwrote and signed several medical forms.  ECF No. 43-2 at 2481-82, 85-89.

On April 3, 2015, petitioner presented to the emergency room at the University of Utah with a complaint of worsened bilateral leg swelling.  She was discharged that same evening with instructions to wear the compression stockings, start a low-dose diuretic, and follow up with her primary care provider in the next week to monitor electrolytes and edema.  ECF No. 43-2 at 2496-97, 2505-41.

On April 10, 2015, petitioner handwrote and signed a fifteen-year work history report in support of her SSDI claim.  ECF No. 40-1 at 297-304.

Petitioner's health insurance provider denied authorization for a nursing assessment/ evaluation and a home health/ certified nurse aide in April 2015.  ECF No. 43-3 at 4.  It authorized payment for a customized power wheelchair in May 2015.  ECF No. 43-5.  It authorized a further six months of IVIg in June 2015.  ECF No. 43-3 at 3.

On May 6, 2015, petitioner followed up with her physical medicine and rehabilitation doctor at the University of Utah.  He recorded that she had tapered off steroids, was "ambulating relatively unlimited distances with just a single-point cane," and was "actually back to doing some teaching and also some translating."  She felt like she was "continuing to improve on a daily basis."  She would return in three months.  ECF No. 40-1 at 1244-46.

On May 18, 2015, petitioner followed up with her neurologist, who recorded that she was doing well.  She had continued fatigue, weakness in her core, and difficulty lifting her leg.  Her strength was continued to improve and was "overall very happy with her progress."  She would continue IVIg for six more weeks.  She would return in three months.  ECF No. 40-1 at 1227-32; *see also* ECF No. 40-1 at 1304-06 (reflecting petitioner's multiple communications about SSDI claim, including in-person visit to SSA office, in May 2015).

On June 3, 2015, petitioner followed up with her rheumatologist.  She was able to walk a short distance each day and get up on the examination table with help.  She still had leg swelling.  The rheumatologist planned an EKG to rule out heart involvement.  If there was evidence of congenital heart failure, she might be a candidate for rituximab.  ECF No. 40-1 at 1383-90.

On June 5, 2015, the SSA denied petitioner's SSDI application.  ECF No. 40-1 at 1287-1300.  Her myopathy was seen to be the "primary" priority which was "severe" in nature.  *Id.* at 1295.  She was also noted to have "non-severe" affective, anxiety, and/or organic mental disorders, which were attributed to the steroids and stress associated with her myopathy.  *Id.*  The myopathy was "not expected to remain severe enough for twelve months in a row to keep [her] from working."  *Id.* at 1300.  *See also id.* at 1307-1310 (supplemental information including 60-day deadline for filing a request for reconsideration).

On June 13, 2015, petitioner presented to the emergency room with complaints of abdominal pain.  She underwent an appendectomy and was discharged the next day.  ECF No. 40-1 at 1391-1409.

On July 1, 2015, petitioner returned to her rheumatologist, who noted the appendectomy and continued IVIg infusions.  The rheumatologist prescribed nifedipine.[16]  ECF No. 40-1 at 1410-18.  The rheumatologist also repeated her plan for an EKG, which yielded no significant findings on August 10, 2015.  ECF No. 40-1 at 1423-25.

In July 2015, petitioner hand-wrote a "request for reconsideration" and a "disability report – appeal" of her SSDI application.  She averred that her "physical strength is slowly coming back" but that her condition was very rare.  Her IVIg treatment "simply treat[ed] the symptoms not the disease."  It was also expensive, not covered by insurance indefinitely,

---

[16] Nifedpine is a treatment for hypertension.  *Dorland's* at 1276.

"experimental," and with unknown side effects. She reported "mental stress of now [sic?] knowing and going heck [sic] to a paralysis state of physical impairment." She named an attorney with expertise with SSDI claims and averred that he would forward "a complete summary of current stats." ECF No. 40-1 at 1336-46; *see also id.* at 1326-34 (transcribed copy of petitioner's submissions). Although petitioner referenced a specific attorney and law firm by name, those do not appear anywhere else in the record. The SSA did obtain updated medical records from her providers. In August 2015, petitioner hand-wrote another list of individuals who were familiar with her condition. ECF No. 40-1 at 1372. She also handwrote another function report. ECF No. 40-1 at 1374-81. On August 26, 2015, the SSA sustained its denial of petitioner's SSDI claim. ECF No. 40-1 at 1434-56.

On October 13, 2015, petitioner returned to her neurologist. ECF No. 40-2 at 1468-74. He took the following interim history:

> She was last seen in 5/2015. She was continued on IVIg 1g/ kg q6 weeks with gradual improvement. Her last one was 6 weeks ago. She does have weaning off phenomenon before her next dose; she experiences weakness in her hands and mild dysphagia 1-2 weeks before her next dose is due. She also reports nausea about 2 days before her next IVIg. She denies significant side effects on IVIg. She has some mild headache which resolves within a day. She reports overall, she is improving. She has some stiffness in the morning, about an hour to get going. She does light weights three times a week and yoga once a week. Fatigue is lingering on. She is able to do stairs. She denies problems getting out of her truck. She has returned to work, teaching ballet and is working as a Portuguese translator. She is overall very happy with her progress. Denies SOB.

ECF No. 40-2 at 1469. A physical examination including neurological was normal. The neurologist recommended IVIg every four weeks (an increase from every *six* weeks) until a plateau was reached. At that time, they would plan an alternative immunosuppressive agent such as IV solumedrol, oral steroids, or steroid-sparing oral immunosuppressants like Cellcept. She would return in four months. ECF No. 40-2 at 1470-72.

On March 7, 2016, petitioner presented to the emergency department after she "was painting a door today and had door fall on her, striking the back of her right leg." She reported numbness and tingling from the calf down into the toes. She was found to have an abrasion to the distal posterior right leg and an x-ray was consistent with trauma. She denied other injury. She was discharged to follow up with her primary care provider. ECF No. 40-2 at 1475-93.

On May 31, 2016, petitioner followed up with her neurologist. She had been getting worse. Her symptoms were worse in the right proximal arm. She had constant back pain. She could barely walk. She could not lift her legs off the ground and could only shuffle. She had about seven falls in the previous two months. Petitioner "initially had a very good response to IVIg allowing her to return to teaching ballet" but stopped teaching in November 2015. Lab work demonstrated that her CK had changed from 339 U/l (within the reference range provided in the St. Mark's Hospital lab records) in October 2015 to 8,900 U/l (well above the reference range) in May 2016. The neurologist determined that petitioner would continue to receive IVIg

with the addition of high dose steroids and rituximab.  Otherwise, she would return in three months.  ECF No. 40-2 at 1494-1501; *see also id.* at 1502-78 (subsequent appointments).

In June 2016, petitioner secured representation by an attorney with expertise with SSDI claims.  *See* ECF No. 40-2 at 1528-35.  She reinitiated her SSDI claim.  ECF No. 40-2 at 1553. On June 23, 2016, a SSA employee conducted a telephone interview with petitioner.  ECF No. 40-1 at 1460-70.  Petitioner authorized requests for additional medical records.  In July 2016, petitioner handwrote another work history report and another function report.  ECF No. 40-1 at 1547-62.  Her mother also completed a function report.  ECF No. 40-1 at 1571-79.  On August 30, 2016, petitioner underwent a confidential psychological report arranged by the SSA.  ECF No. 40-2 at 1542-50.  On September 1, 2016, she underwent a neuro-comprehension exam arranged by the SSA.  ECF No. 40-2 at 1581-88.  In September 2016, the SSA approved petitioner's SSDI claim.  She was determined to be disabled as of January 29, 2015, based on a primary impairment of severe myositis, secondary severe impairment of immune suppression and growth failure, as well as non-severe ADD/ADHD, substance addiction, and psychiatric disorders.  ECF No. 40-2 at 1589-1609, 1624-47.  Petitioner later reported income from working as a cab driver and an interpreter during 2016 - 2017.  ECF No. 40-2 at 1648-85.

## B.  Affidavits

Petitioner submitted numerous affidavits from herself and others with personal recollections of the events in question – in particular, her mental and physical capacity from the onset of her myopathy in October 2014 and the subsequent months.  As stated above, petitioner is seeking to establish that she was incapacitated for at least ten months, until late August 2015, to support equitable tolling and to render her claim timely filed.  The affidavits are all dated between October 2018 – February 2019.  ECF No. 40.

### 1.  Petitioner

Petitioner herself submitted an affidavit.  She averred that she was healthy prior to the flu vaccine on October 17, 2014.  ECF No. 40-6 at 1-3.  She addressed her history of traumatic injury including when her car was struck by a train, and seeking chiropractic treatment for "pain", but not her other complaints, including muscle weakness and difficulty swallowing, that shortly pre-dated the flu vaccine.  *Id.*, *compare to* ECF No. 42-2 at 16, 19; ECF No. 40-1 at 198-204.  She averred that the onset of her myopathy was after the flu vaccine, "within three days, that is, by the 20th of October, 2014" when she "experienc[ed] weakness and swallowing difficulties ([she] had trouble swallowing a Wendy's meal [she] purchased at the drive-thru)". ECF No. 40-6 at 3.

Petitioner recalled that after the onset of these symptoms, she went to the primary care provider ("the Sanford Health Dickinson Clinic"), where she was assessed with a mild case of the flu and she should rest.  ECF No. 40-6 at 3.  However, the contemporaneous medical records reflect that she first went to the chiropractor on October 20 and October 27, 2014.  ECF No. 42-2 at 23-24.  Over two weeks later, on November 7, 2014, she returned to the primary care provider to review the x-rays of her lumbar and cervical spine.  She entered in a wheelchair, reported that she had fallen in the parking lot, and "yelled" at the primary care provider for asking about it. The primary care records do not include any complaints or assessment of muscle weakness or

difficulty swallowing.  ECF No. 40-1 at 205-14.  Thus, petitioner's recollection of the earliest events conflicts with the medical records.

Petitioner averred that in early November 2014, she could "hardly move [her] limbs at all and could hardly breathe."  ECF No. 40-6 at 4.  Her then-boyfriend drove her from North Dakota to Utah.  *Id.*  Her mother took her to the emergency room at St. Mark's Hospital in Salt Lake City, Utah.  *Id.*  Following her admission, she was "under 24 hour supervision… [she] had a feeding tube for dysfasia [sic] and speech therapy and was completely unable to care for [her]self or to make any cognitive decisions."  *Id.*; *but see generally* ECF Nos. 42-5 at 118 (discharge summary providing that petitioner had participated in physical therapy and occupational therapy, and was "consulting a doctor in Pennsylvania regarding alternative treatments").

Petitioner averred that after St. Mark's Hospital, she was moved to inpatient nursing facilities that were "not well equipped to handle the constant level of care and attention that I required" and "suggested" that she and her mother "go to the University of Utah Hospital emergency room who would have to admit me."  *Id.*  She does not directly address her capacity while in the nursing facility.  However, the contemporaneous medical records reflect that while in that facility, petitioner successfully spoke with an administrator, secured a private room, left the facility several times (with assistance), contacted her "attorney" who called the police to escort her boyfriend off the property, and made other decisions on her own behalf.  *See generally* ECF No. 43-1.  Additionally, the nursing facility records reflect that she was discharged for non-compliance with care and orders for therapy at home.  ECF No. 43-1, 7, 85.  Petitioner then presented to the University of Utah emergency room for a second opinion.  Those providers confirmed that she had been discharged for being "non-compliant with care" and had arrangements for home nursing.  She was discharged home in stable condition.  ECF No. 40-1 at 101.  Afterwards, petitioner participated in two outpatient consults.  ECF No. 43-2 at 35-44 (primary care appointment, reflecting petitioner's own statements about the stress of her illness on the relationship with her mother), *id.* at 17-25 (rheumatology appointment, including new patient form handwritten and signed by petitioner).

Petitioner averred that she "then suffered a heart attack due to improper dosage of steroids which caused [her] to be admitted to the Intensive Care Unit (ICU) at the University of Utah."  ECF No. 40-6 at 5.  The contemporaneous medical records reflect that on January 25, 2015, petitioner was indeed admitted to the University of Utah by the cardiology team.  However, they did not find evidence of cardiac involvement and transferred petitioner to the neurology team.  ECF No. 43-2 at 75-76.

Petitioner was transferred to the neurology department, then to an inpatient rehabilitation facility at the University of Utah where she remained until March 18, 2015.  Petitioner's affidavit provides that during this time, she was "unaware of [her] surroundings and unable to make any decisions" and "mentally incapacitated".  In contrast, the medical records provide that "*Initially*, Pt [patient] exhibited confusion, delusional cognition, and disorganized executive skills."  ECF No. 43-2 at 1211 (emphasis added).  But there are numerous notations of petitioner communicating on her own behalf including her preferences towards care, her motivation towards rehabilitation, and her appreciation of the support and structure provided in the rehab facility.  She was anxious about maintaining that structure when she returned home and she

discussed stress management strategies with her providers.  *See generally* ECF No. 43-2 at 101-1214.  Upon discharge, she was noted to be confident, in good spirits, and aware of the outpatient treatment plan.  *See generally* ECF No. 43-2 at 1198-1216.

Petitioner averred that during her hospitalization at the University of Utah from January – March 2015, she was also "physically… incapacitated", she was "completely immobile" and "had to be fed intravenously or spoon fed".  ECF No. 40-6 at 5-6.  To the contrary, the contemporaneous records reflect that petitioner made significant progress with muscle strength and swallowing by March 2015. *See generally* ECF No. 43-2 at 1198-1214, 2467-94.

Petitioner did not detail her course after March 2015.  She averred more generally:

> Thus, from my admission to St. Marks at the end of October 2014 and continuing for at least 16 months [i.e., to the end of February 2016], I was not only physically incapacitated from the necrotizing myopathy resulting from the flu vaccine administered to me on 17 October, 2014, but I was unable to talk, to communicate or to form cogent thoughts.  I was mentally unable to make decisions regarding my medical treatment, how to respond to visitors, how to prepare for my future, for in my mind, I had no future and I lived from minute to minute without any plans.  I could not form any type of social or business relationship with anyone, as I was totally incompetent and incoherent and I could not form any plans or thoughts regarding any claim I had.

ECF No. 40-6 at 6.  In contrast, the medical records provide that following discharge from the rehabilitation facility in March 2015, petitioner progressed in her recovery for a number of months.  *See generally* ECF No. 43-3 at 3-5 (health insurance approval for motorized wheelchair and continued IVIg, but denial for home health aide); ECF No. 43-2 at 2492-2541; ECF No. 40-1 at 1227-1425.  She also taught dance and did some translating work starting in May 2015 and continuing to at least October 2015.  ECF No. 40-1 at 1244-46, 1468-74, 1494-1501.  Also in summer 2015, she appealed her SSDI claim to the SSA.  ECF No. 40-1 at 1304-06, 1287-1310, 1326-46, 1372-81, 1434-56.  These records, as well, support a finding of mental and physical capacity.

It appears that later in the fall of 2015, petitioner began to lose muscle strength and stopped working, at least as a dance instructor.  (It is not clear if and/or when she stopped working as a translator.)  That history was not taken at an emergency room visit in March 2015.  ECF No. 40-2 at 1475-93.  But it was taken at the May 31, 2016 follow-up with the neurologist, who started petitioner on rituximab.  ECF No. 40-2 at 1494-1501.

Petitioner further averred:

> … It was not until they added [r]ituxima[b] in 2016 to my IVIg treatment… that I noticed a change within a day or two that helped me feel both mentally and physically able to attempt activities of daily living that I used to do.

> As soon as I was able to get about by myself, I began assembling medical records from North Dakota, St. Mark's Hospital, University of Utah Care Hospital, and the two care centers so that I could put together for myself what had happened to me over the last four years and so I could provide medical records to my SSDI attorney.
>
> I then became aware of the Vaccine Act and contacted a number of vaccine attorneys who I found over the internet, all of whom lived outside of Utah where I live. All of the vaccine attorneys expressed interest in my case until I realized that I was a few months over the time for filing a petition, and they then lost interest, which delayed me for about six months.

ECF No. 40-6 at 6-8. Petitioner accurately stated that shortly after starting rituximab, she retained an attorney specializing in SSDI claims and reinitiated that claim, eventually resulting in a favorable determination in September 2016. ECF No. 40-2 at 1528-35. However, it remains true that petitioner herself began that claim in January 2015 and submitted further information, including handwritten forms detailing her own condition, throughout the following months. Her claim was initially denied on the expectation that her myopathy (and by extension, her mental status) would improve. The claim was only approved later after petitioner retained counsel and perhaps more importantly, she suffered a relapse of her condition necessitating further treatment.

Petitioner also averred that *after* retaining the SSDI attorney and resubmitting her SSDI claim, she "then became aware of the Vaccine Act." ECF No. 40-6 at 8. This, rather than her alleged mental and/or physical incapacity, appears to be the principal reason for why she did not file the petition earlier.

### 2. Treating Providers

Petitioner also provided an affidavit from Katarina Waters, DNP, APRN, who is employed within the University of Utah Health System. Ms. Waters recalled that petitioner was admitted to the University of Utah Hospital on January 25, 2015, after which she was "mentally and physically incapacitated and dependent for all of her cares." ECF No. 40-6 at 16. Petitioner was in inpatient rehabilitation at the University of Utah Hospital until March 18, 2015. *Id.* Ms. Waters averred that "after inpatient rehabilitation[,] she [petitioner] was transferred to skilled nursing facility for further cares." *Id.* But contemporaneous records, including those made by Ms. Waters, reflect that in March 2015, petitioner was in fact discharged to her *home* with instructions to continue therapy and follow up with her doctors at the University of Utah. *See, e.g.*, ECF No. 43-2 at 2492-93 (March 30, 2015 follow-up clinic note authored by Ms. Waters).

Ms. Waters also averred: "She [petitioner] was mentally and physically incapacitated for over a year." ECF No. 40-6 at 17. However, this is inconsistent with Ms. Waters's other recollections of petitioner transitioning to outpatient therapy in March 2015 and "progressively ma[king] improvements in strength" thereafter. *Id.* This is also inconsistent with the contemporaneous medical records, discussed above.

Ms. Waters averred that as a result of her necrotizing myopathy, petitioner lost the ability to work and has experienced ongoing financial stress and psychological issues. *Id.* I do not question these allegations. However, they do not negate the contemporaneous evidence that during the time in question, petitioner was generally able to communicate on her own behalf and pursue her SSDI claim.

The medical records reflect that Ms. Waters indeed had firsthand recollection of petitioner during the hospitalization ending in March 2015 and periodically saw petitioner thereafter at follow-up outpatient appointments. However, Ms. Waters's affidavit does not support an allegation of mental and/or physical incapacity, in particular dating past March 2015.

The same is true of the affidavits from two nurses. ECF No. 40-6 at 19, 23. Both treated petitioner at the University of Utah from January – March 2015. Their affidavits do not support a finding of incapacity beyond that point. *Id.*

I have also reviewed the affidavit of a certified nurse assistant ("CNA") who first met petitioner in January 2015. Following petitioner's discharge from the University of Utah in March 2015, petitioner's mother hired this CNA to provide in-home assistance through August 2015. ECF No. 40-6 at 34-35; *see also* ECF No. 43-3 at 4 (April 2015 letter from petitioner's health insurance company denying coverage for this kind of care). The CNA averred that post-discharge, petitioner "had a few good days" but was "unable to care for herself in any meaningful way", apparently not being able to eat, brush her hair, bathe, use the bathroom, or make daily decisions on her own. "By August 2015, [petitioner] could feed herself soup." ECF No. 40-6 at 34. However, the contemporaneous medical records indicate that petitioner could perform many of these tasks upon her discharge in March 2015. Over the ensuing months, she had numerous follow-up appointments with her doctors and therapists; they did not record that she was losing function. It would seem that if petitioner, her mother, and/or the CNA reported these issues with her doctors, they would be present in the contemporaneous records.

The CNA also averred that petitioner was "not able to cope with daily demands or pressures or make rational daily decisions on her own" through August 2015. *Id.* These statements, as well, are not consistent with the contemporaneous records of petitioner's application and appeal for SSDI over the summer of 2015. Additionally, the treating physicians recorded that petitioner was teaching dance and translating from approximately May – November 2015. I do not see reason to dispute the accuracy of these statements in the contemporaneous medical records. Accordingly, the CNA's affidavit does not provide much persuasive support for either mental or physical incapacity past March 2015.

### 3. Additional Witnesses

I have also reviewed the affidavits of several other witnesses. Petitioner's former boyfriend recalled the onset of her symptoms, transporting her from North Dakota to Utah in November 2014, and being barred by petitioner from the Spring Creek inpatient rehabilitation facility in January 2015. ECF No. 40-6 at 37. He averred that afterwards: "We barely talked for almost 2 years." *Id.* The former boyfriend's affidavit tends to support that petitioner

experienced physical and mental impairment in early 2015.  However, there are no details beyond that time.  It does not support a finding of extended incapacity.

Petitioner's mother also submitted an affidavit.  ECF No. 40-6 at 30-31.  This is somewhat difficult to follow.  She addressed petitioner's condition following discharge during April – August 2015, then jumped to petitioner's "transfe[r] to the Highland Ridge Nursing Home… for approximately one month", then jumped to petitioner's admission to the University of Utah from January - March 2015, then jumped back to petitioner's condition following discharge.  *Id.*  I can accept that even following petitioner's discharge in March 2015, the mother provided support and assistance with daily tasks.  This would have necessitated significant adjustments in their lives and their relationship with one another.  The mother may be commended for assisting her daughter throughout this time.  However, that does not necessarily support a finding of incapacity which is not reflected in the contemporaneous medical records. *Compare to Gray v. Sec'y of Health & Human Servs.*, No. 15-146V, 2016 WL 6818884 (Fed. Cl. Spec. Mstr. Oct. 17, 2016) at *3 (reasoning that "the lack of formal mental capacity evaluation during the period of alleged incapacity does not necessarily indicate that no concerns existed", crediting the petitioner's daughter's occupation as a registered nurse and her active involvement in petitioner's care).

Petitioner's brother also submitted an affidavit, which addressed her health prior to the flu vaccine in October 2014 and her "extensive hospitalizations from late 2014 through 2015." ECF No. 40-6 at 21.  He recalled purchasing petitioner's home at some unspecified time.  *Id.*  He recalled that petitioner has been living with their mother since May 2015.  *Id.*  He averred, "Throughout 2016 to the present, [petitioner's] health has made significant improvements but the severity of her physical symptoms and their emotional ramifications continue to make it difficult for her to function unassisted."  *Id.*  I am, again, sympathetic for what the family has experienced, but the brother's affidavit is generally vague and does not support a finding of incapacity during the specific dates in question.

I also have difficulty with the affidavit from a friend who met petitioner through their respective boyfriends around the time of the vaccination and visited multiple times thereafter. ECF No. 40-6 at 49-50.  The friend's affidavit supports that petitioner had a significant medical condition that required hospitalization.  However, it does not provide much detail to rebut or supplement the contemporaneous medical records reflecting that petitioner was judged to be sufficiently stable to be discharged in March 2015 and upon follow-up appointments through to the end of the year.

There are also affidavits from several professional acquaintances.  The first is from a theatre manager/director who first met petitioner in 2010.  ECF No. 40-6 at 13.  He averred that in 2015, petitioner "quickly devolve[d] and became incapacitated – both physically and mentally. I visited her on three or four occasions and was startled by her rapid decline."  *Id.*  "Over the past few years she has gone back and forth with her health and I am amazed she has somewhat recovered."  *Id.*

A second professional acquaintance averred that she heard secondhand that over the winter and going into the spring of 2015, petitioner's "condition mentally and physically was

further declining… she was not taking visitors because she was not able to verbally communicate and she was physically very frail with some paralysis." ECF No. 40-6 at 12. "Since that time", the second professional acquaintance had seen petitioner "a few times." *Id.*

The third professional acquaintance is an attorney who first met petitioner in 2010 and donated some legal services to her different charitable enterprises. ECF No. 40-6 at 28. He averred that he visited petitioner in St. Mark's Hospital, "a nursing home" and the University of Utah hospital "[b]etween the dates of November 2014 and March 2015". *Id.* He averred that "her physical condition and general appearance was corpse-like" and he was seriously concerned about whether she would survive. *Id.* He did not provide much more detail about her physical or mental capacity or events past March 2015. *Id.*

These professional acquaintances' affidavits, again, are consistent with the medical records reflecting that petitioner had an acute onset and extensive hospitalizations until March 2015. However, they do not rebut the subsequent medical records, which indicate that petitioner was stable and was returning to activities of daily living from March to October or November of 2015.

The last affidavit is from an attorney who eventually represented petitioner in her SSDI claim. ECF No. 40-6 at 25-26; *see also* ECF No. 40-2 at 1528-35 (SSDI claim paperwork reflecting this attorney's appearance). As noted above, petitioner is alleging mental and physical incapacity beginning in November 2014. She began the SSDI claim without formal legal representation on January 29, 2015. The attorney averred that he represented petitioner in the SSDI claim from June 8, 2016 – January 19, 2017. ECF No. 40-6 at 25. Thus, he did not offer and would not have any personal recollections to support a finding of mental and/or physical incapacity before that date. *Id.*

## IV.   Analysis

Petitioner filed this Vaccine Act petition on August 23, 2018, alleging that she received a flu vaccination on October 17, 2014 and developed "muscle weakness and swallowing difficulties", representing the first symptoms or onset of myositis, on October 20, 2014. *See* Petition (ECF No. 1); Petitioner's Response to Motion to Dismiss (ECF No. 23) at 4. Based on these allegations, the petition was filed approximately ten months after the expiration of the statute of limitations period. *See* § 16(a)(2) (providing that a Vaccine Act petition must be filed within thirty-six months of the first symptoms or onset of the alleged injury). However, petitioner contends that the Vaccine Program allows for equitable tolling on the basis of extraordinary circumstances, including a showing of mental and/or physical incapacity. Petitioner contends that she was mentally and physically incapacitated "from the onset of her physical symptoms through the Spring of 2016, a period of sixteen (16) months", which should justify the application of equitable tolling and render her claim timely filed. Petitioner's Response at 13.[17]

---

[17] Of note, petitioner and her attorney filed this response *before* obtaining and filing outstanding records from the University of Utah Hospital and from the SSDI claim. See Petitioner's Response (ECF No. 23); Scheduling Order (ECF No. 29) at 2-3; Orders Granting Subpoenas (ECF Nos. 36-37); Medical Records (ECF Nos. 40-43). Respondent has filed a response addressing this supplemental evidence (ECF No. 46). Petitioner has not. I have

Respondent contends that incapacity is not an appropriate basis for equitable tolling of the Vaccine Act's statute of limitations.  Respondent's Motion to Dismiss (ECF No. 9) at 5-6.

In the event that I disagree (as in *Gray*, 2016 WL 787166), alternatively, respondent contends that petitioner has not established mental or physical incapacity to the extent that she was prevented from filing her claim.  *Id.* at 6.  Moreover, petitioner has not shown that any such incapacity persisted for a sufficient period to render her claim timely filed.  *Id.*  The contemporaneous medical records reflect that by February or March 2015, petitioner was doing well.  *Id.*; *see also* Respondent's Reply in Support of Motion to Dismiss (ECF No. 24) at 7-10; Respondent's Response to Supplemental Evidence (ECF No. 46) at 2.

As noted above in the legal standard, there have been only two cases, *Hodge* and *Gray*, in which special masters have found evidence of mental incapacity sufficient to justify the extraordinary remedy of equitable tolling.  It should be emphasized that in each case, the petitioner provided evidence of mental incapacity that was not contradicted by the contemporaneous medical records.

In the present case, a full review of the evidence does not support petitioner's allegation of incapacity.  It is undisputed that her pre-vaccine history included trauma and anxiety, but she was generally able to function in society.  It is also undisputed that in October 2014, she developed severe myositis including pronounced muscle weakness and difficulty swallowing.  This condition led to her hospitalization in November 2014, insertion of nasogastric and PEG gastrostomy tubes in December 2014, time at a nursing facility in January 2015, and hospitalization at the University of Utah on January 18, 2015.  She participated in extensive physical, occupational, and speech therapy, received considerable steroids, and was started on IVIg on January 28, 2015.  She was discharged from the University of Utah inpatient rehabilitation facility on March 18, 2015.  The medical records reflect that this was a significantly stressful period in petitioner's life which included certain disputes with her then-boyfriend and the medical providers.  Despite the stress, muscle weakness, and difficulty swallowing, there are numerous notations of petitioner communicating and making decisions on her own behalf.  Additionally, I find it highly significant that when petitioner was still hospitalized at the University of Utah, she initiated her SSDI claim.  She also participated in at least one lengthy phone call with an SSA representative and she handwrote and signed at least two detailed forms.  There is no indication that petitioner was assisted by the medical providers, her mother, or any acquaintances in providing this information for her SSDI claim.  The January 2015 SSDI claim is not addressed in the parties' briefs or in any of the affidavits.  I find that petitioner's initiation of the SSDI claim in January 2015, while she was hospitalized at the University of Utah, supports a finding of both mental and physical capacity at that time.

By the time of her discharge on March 18, 2015, petitioner had made material improvements in swallowing.  Her muscle strength had improved particularly in her arms: she was independent with self-feeding and toileting, could change the music on a car radio, could hold a phone, and could hand-write forms.  Her mental attitude had improved with psychological treatment and cognitive and behavioral strategies to help with anxiety and improve sleep.  She

---

independently reviewed the evidence and concluded that this matter is ripe for adjudication, without need for further briefing or argument.

was encouraged to continue her rehabilitation in the outpatient setting. Petitioner contends that March 2015 reflects her best condition throughout the period of alleged incapacity, which was "just after she had received her first Rituxan [rituximab] IV treatment… [she] did not receive any of this treatment from April – August 2015…" Petitioner's Response at 21; *see also id.* at 19, 22; ECF No. 40-6 at 16, 19 (two nurses' affidavits suggesting that petitioner received rituximab at the University of Utah). However, upon careful review, the University of Utah records do not reflect *any* treatment with rituximab during the spring 2015 hospitalization. That was only considered. *See, e.g.* ECF No. 43-2 at 766 (February 11, 2015 neurology note providing that at the next visit, they would evaluate whether rituximab "might be indicated"), 2455 (February 24, 2015 neurology note: "should she have lack of improvement or worsening, then we would consider starting Rituxan"); 2464 (February 27, 2015 rheumatology note: "Agree with early rituximab therapy if no further improvement of muscle strength"); *id.* at 2420 (March 13, 2015 neurology discharge summary not mentioning rituximab); ECF No. 40-1 at 1226-28 (May 18, 2015 neurology follow-up not mentioning rituximab); *id.* at 1388 (June 3, 2015 rheumatology follow-up providing, "she might be a candidate for rituximab"). Therefore, I find that the March 2015 records are not an anomalous snapshot of petitioner's "best condition", instead, they reflect her steady improvement which was expected to continue in the outpatient setting.

Petitioner argues that following discharge, she "did not receive any of the treatment [rituximab] from April – August 2015, when her caretakers testified she regressed and relapsed…" Petitioner's Response at 21. As noted above, there are no contemporaneous medical records indicating that petitioner received rituximab shortly before her discharge. Moreover, after discharge, petitioner had multiple medical encounters at which she was assessed to be mentally and physically stable. ECF No. 40-1 at 1227-32 (May 18, 2015 neurology follow-up), *id.* at 1383-90 (June 3, 2015 rheumatology follow-up), *id.* at 1391-1409 (June 13, 2015 hospital admission for appendicitis); *id.* at 1410-18 (July 1, 2015 rheumatology follow-up), ECF No. 40-2 at 1468-74 (October 13, 2015 neurology follow-up providing that petitioner experienced "a weaning-off phenomenon" approximately four weeks after each IVIg treatment but she was exercising, back at work, and "overall very happy with her progress").

The SSDI records also reflect that petitioner maintained mental and physical capacity after her discharge. First, in June 2015, the SSA denied her SSDI application. ECF No. 40-1 at 1287-1310. The denial letter provided that petitioner's myopathy "was not expected to remain severe enough for twelve months in a row to keep [her] from working." *Id.* at 1300. In response, in July 2015, petitioner handwrote a request for reconsideration and an appeal. She reported that her "physical strength is slowly coming back", but she was stressed that her insurance coverage for IVIg would run out and that her condition might relapse. She reported being in touch with an attorney with expertise in SSDI claims. *Id.* at 1336-46. In August 2015, petitioner hand-wrote additional forms in support of the appeal. *Id.* at 1372, 1374-81. On August 26, 2015, the SSA sustained its denial of the appeal. *Id.* at 1434-56. These records reflect that in the summer of 2015, petitioner had sufficient executive function to respond to the denial of her SSDI claim and communicate in writing why it should be reconsidered. She also had sufficient motor strength to handwrite and sign multiple forms. In other words, her alleged mental and/or physical impairments at this time did not render her "incapable of handling [her] own affairs or unable to function in society." *Barrett*, 363 F.3d at 1321.

Petitioner, her mother, and the other individuals are commended for navigating through this difficult medical course. They are also thanked for submitting affidavits in support of her argument for equitable tolling. However, as discussed above, the affidavits are inconsistent with the contemporaneous medical records and/or lack personal recollections of the crucial time period from March – September 2015. *See generally* ECF No. 40-6. I cannot conclude that these later statements are sufficiently "consistent, clear, cogent, and compelling" to outweigh the contemporaneous records. *Camery*, 42 Fed. Cl. at 391. Additionally, the affidavits and other evidence supports the conclusion that petitioner did not file earlier because she was not aware of the Vaccine Program. *See* ECF No. 40-6 at 8 (petitioner's affidavit providing that in 2016, she "then became aware of the Vaccine Act and contacted a number of vaccine attorneys").

## V. Conclusion

In conclusion, the evidence demonstrates a period of significant physical disability, but not sufficient to render petitioner "incapable of handling [her] own affairs or unable to function in society." *Barrett*, 363 F.3d at 1321. To the contrary, petitioner remained able to communicate verbally and in handwritten statements.

Neither does the evidence support a finding of mental incapacity. In fact, the contemporaneous records reflect that during the time in question, petitioner actively participated in treatment decisions. She also initiated and pursued an SSDI claim on her own which included identifying her medical providers, detailing her medical and work history, and providing the names and contact information of witnesses to support her claim. Petitioner followed the SSDI claim procedure and timely filed an appeal. The contemporaneous medical records also reflect that during the relevant time period, petitioner earned income by teaching dance and translating.

Petitioner candidly acknowledges that she did not learn of the Vaccine Act until after the statutory limitations period for her claim had expired. Petitioner acknowledges that multiple attorneys with experience in the Vaccine Program declined to represent her case for the same reason. Unfortunately, the Vaccine Act does not provide a remedy for this misfortune. Accordingly, I must conclude that the claim was not timely filed and that the evidence does not support a finding of incapacity to overcome that issue.

Accordingly, respondent's motion to dismiss the petition is **GRANTED.** The petition is **DISMISSED**. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court shall enter judgment in accordance herewith.[18]

**IT IS SO ORDERED.**

<u>s/Thomas L. Gowen</u>
Thomas L. Gowen
Special Master

---

[18] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review. Vaccine Rule 11(a).